IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

ANTHONY L. RIVERS,           §
     Plaintiff,               §
                           §
vs.                        §          CIVIL ACTION NO. H-04-3292
                           §
JO ANNE B. BARNHART,    §
Commissioner, Social        §
Security Administration,     §
     Defendant.            §

**MEMORANDUM AND RECOMMENDATION ON
CROSS-MOTIONS FOR SUMMARY JUDGMENT**

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial management, under 28 U.S.C. § 636(b)(1)(A) and (B).  (Docket Entry # 8).  Before the court are competing motions for summary judgment, which were filed by Plaintiff Anthony L. Rivers ("Plaintiff," "Rivers") and Defendant Jo Anne B. Barnhart, in her capacity as Commissioner of the Social Security Administration.  ("Defendant," "the Commissioner").  (Motion For Summary Judgment ["Plaintiff's Motion"], Docket Entry # 14; Memorandum of Points and Authorities in Support of Plaintiff's Motion for Summary Judgment ["Plaintiff's Memorandum"], Docket Entry # 15; Defendant's Motion For Summary Judgment ["Defendant's Motion"], Docket Entry # 13; Defendant's Memorandum in Support of Motion for Summary Judgment ["Defendant's Memorandum"], Docket Entry # 12). Each party has responded to the other's motion. (Defendant's Response to Plaintiff's Motion for Summary Judgment ["Defendant's Response"], Docket Entry # 18; Plaintiff's Reply to Defendant's Response to Plaintiff's Motion for Summary Judgment ["Plaintiff's Reply"], Docket Entry # 19).  After considering the motions, the evidence submitted, and the applicable law, it is RECOMMENDED that Plaintiff's motion be **GRANTED**, and that

1

Defendant's motion be **DENIED**.  Rivers' claim should be reversed, under the fourth sentence of 42 U.S.C. § 405(g), and remanded with instructions to the Commissioner  to grant Plaintiff's application, and to calculate the benefits due to him.

**Background**

Although this lawsuit represents Rivers' first request for judicial review, the complex procedural  history of his administrative claims  requires a brief  explanation so that his complaint is viewed in the proper context.  For the sake of  clarity, suffice it  to say that Rivers previously filed two claims for SSA benefits.  The first of these was filed in 1997, and it was the subject of a hearing before an Administrative Law Judge ("ALJ") in March 2001.  (Tr. at 182).  The ALJ rejected that claim in a written decision, issued on May 24, 2001.  (Tr. at 45, 114).  While both the hearing and the decision on that claim were pending, however,  Rivers filed another, different claim in 1999.  (Tr. at 908).  That claim was rejected, in September 2001, without a hearing. (Tr. at 123, 938).  Ultimately, both of  Rivers' claims were reviewed by the SSA Appeals Council and it issued a decision on them in  February 2003.  (Tr. at 170).  On review, the Appeals Council remanded  both claims and ordered that they be consolidated for a subsequent hearing before a new ALJ.  (*Id.*).  In addition to directing that a different ALJ entertain them, the Appeals Council also specified that certain matters, critical to Rivers' claim for benefits, were to  be developed or clarified at the new hearing.  (Tr. at 169-170).

Rivers did receive another hearing in January 2004.  (Tr. at 74).  Again, his claim was rejected in a written decision which was issued on  February 20, 2004.  (Tr. at 30).  That decision was reviewed, in turn, by the SSA Appeals Council.  In September 2004, the Appeals Council again found errors in the ALJ's decision on Rivers' claim for benefits.  But this time, it did not remand for

a new proceeding.  Instead, the Appeals Council made its own findings, purportedly from the hearing  record, in an apparent effort to correct the errors which Rivers' cited in his request for a reconsideration before that body.  (Tr. at 17).  Even though the Appeals Council made revisions to the findings, however, it ultimately affirmed the ALJ's February 2004 decision to deny benefits. (Tr. at 18).  It is that action that Rivers' complains of  before this court.

Rivers contends that the ALJ's decision to deny him benefits was not supported by the record evidence, and that the Appeals Council action did not, and could not, cure that error.  (Plaintiff's Memorandum at 4; Plaintiff's Reply at 1).  He argues that, just as the ALJ was without sufficient evidence to support his conclusions on his ability to engage in gainful employment, so was the Appeals Council.  (*Id.*).  For that reason, it appears,  Rivers' arguments center almost entirely on the ALJ's findings and the proceedings before him.  Defendant, however, in response to the allegations, relies almost entirely on the Appeals Council decision to argue that any error at the administrative level has already been addressed and remedied.  (Defendant's Memorandum at 5-6).  To reconcile which of these decisions should frame Rivers' pending complaint, it is necessary to determine, at the outset, the contours of the Appeals Council's authority to "correct"  the fact findings by an ALJ. If such authority is vested in the Council, then, of course, the next pertinent inquiry  is whether its revisions to the ALJ's findings did, in fact, remedy the errors Rivers has cited. Of equal concern to the court, however, is whether the ALJ actually discharged his obligation to develop the record, as instructed in the remand order of  February 2003.  If not, it appears that his decision is subject to remand or reversal for that reason alone.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the Commissioner used proper legal standards to evaluate the evidence. *Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988).

**Discussion**

In his disability applications, Rivers claimed that he was unable to work because of a combination of physical and mental conditions. He cited his seizure disorder, shoulder injury, tuberculosis, anxiety and depression as so limiting that they preclude employment. (Tr. at 37). In the first proceeding, in 2001, the evidence also revealed that Rivers had previously been awarded benefits, due to a history of substance abuse, but that those benefits ended in 1996, presumably because of the change in the disability law. (Tr. at 100). When the Appeals Council considered

4

Rivers' request to reverse the first ALJ decision, it found deficiencies in several areas.  Among these were the lack of evidentiary support for certain credibility findings; the failure to properly review treating source statements; the failure to evaluate the continued effect, if any, of alcohol use on the claimed impairments; and, especially, the absence of evidence on Rivers' actual residual functional capacity to either return to his prior work as a welder, or to work at any appropriate jobs available to him, given his proven limitations.  (Tr. at 169-70).

It is important to emphasize that, in January 2004, the ALJ was to consider Rivers' claimed impairments anew and to address, specifically, the following items identified by the Appeals Council, among others, in its remand order:

- Consider the claimant's maximum residual functional capacity and provide specific references to the evidence to support the limitations assessed.
- Evaluate treating and examining doctors' opinions and explain weight ascribed to each. if necessary, request additional evidence or clarification from these physicians "about what the claimant can still do despite the impairments."
- Obtain evidence from a medical expert to accurately determine whether any of the claimed impairments meet or equal the applicable SSA disability listings.
- If the claimant is deemed disabled, the expert should give an opinion on whether alcohol abuse is material to the disability.
- Obtain evidence from a vocational expert witness, if warranted, to "clarify the effect of the assessed limitations on the claimant's occupational base."
- And, "the Administrative Law Judge **will ask the vocational expert to identify examples of appropriate jobs** and to state the incidence of such jobs in the national economy."

(Tr. at 169-70) (emphasis added).

In January 2004, then, the ALJ was obliged to consider Rivers' consolidated claims for disability and SSI benefits, and to comply with the specific instructions of the Appeal Council. There is no dispute that the last date on which Rivers was eligible for disability insurance was December

31, 2000, and so the relevant evidence is necessarily limited to any impairments which were proven to have existed on or before that date. At the hearing, in addition to reviewing the available medical records, the ALJ also took testimony from Rivers, from two medical expert witnesses, Dr. Steve Goldstein and Dr. Nancy Tarrand, and from a vocational expert witness, Karen Neilson. (Tr. at 77, 91, 94). Following the hearing, the ALJ issued his written decision, which included a finding that Plaintiff was not disabled, but was, nevertheless, limited in his work options because of his seizure disorder and the effects of alcohol abuse, which he found to be severe impairments. (Tr. at 41). He also concluded that, because of these impairments, Rivers could not return to his previous employment as a welder, but he was not so limited that he could not work at all. (*Id.*). In fact, the ALJ found, from his view of the evidence, that Rivers has no exertional limitations, and could perform a wide range of heavy, medium, and light exertion jobs at an unskilled level, and could perform any unskilled sedentary job, so long as those jobs were consistent with the precautions required by his seizure disorder. (*Id.*). With those findings, he determined that Rivers was not disabled and he denied the benefits claim. (Tr. at 42).

Rivers then asked that the 2004 decision be reviewed by the Appeals Council, and it agreed to do so. In particular, Plaintiff argued that the ALJ had completely the ignored the evidence and impact of one of his medically determinable impairments, ataxia,[1] which was raised at the hearing. (Tr. at 20). Rivers claims that this condition, which is a result of cerebellar atrophy,[2] causes a persistent problem with his gait, which was not considered by the ALJ in making his disability

---

[1] Ataxia is "an condition characterized by impaired ability to coordinate movement," usually seen in a "staggering gait and postural imbalance." *Mosby's Dictionary, Medical, Nursing & Allied Health* 141 (5th ed. 1998).

[2] Cerebellar atrophy is the "deterioration and wasting of tissues of the cerebellum. Causes of the condition include nutritional/metabolic factors such as alcohol abuse and degenerative disease." *Id.* at 297.

determination. (Tr. at 22-23). In addition, Rivers complained to the Appeals Council that the ALJ's conclusion that he could engage in the full range of sedentary work, even if otherwise correct, did not take into account the evidence of his nystagmus,[3] another impairment which the ALJ ignored in making his findings. (Tr. at 23). Rivers insists that the combined effects of all of his impairments make it impossible for him to return to the work force in any capacity, and that the hearing evidence does not support findings to the contrary on his actual residual functional capacity.

In light of Plaintiff's complaints about the ALJ's evidentiary findings, the Appeals Council apparently agreed that some of them were not justified from the record. However, as noted previously, it did not disturb the ultimate finding that Rivers is not disabled and it did not remand the claim for further action. Instead, the Appeals Council merely "revised" the findings to include a determination that Rivers' ataxia is also a severe impairment, in addition to those previously named by the ALJ, a seizure disorder and alcohol abuse. (Tr. at 16-18). For that reason, the Appeals Council set aside the ALJ's finding that Rivers could perform a full range of jobs limited only by restrictions on driving, working at heights, and around dangerous machinery. In its place, the Appeals Council made a finding that Rivers could perform only "a reduced range of sedentary" work, as limited by those same seizure precautions. (*Id.*).

In his lawsuit before this court, Rivers contends that, far from curing the ALJ's purported errors, the Appeals Council action is also subject to reversal because, once again, no findings as to the impact of his nystagmus were made, and because the evidence does not support the conclusion that he can perform even a reduced range of sedentary work. (Plaintiff's Memorandum at 6;

---

[3] Nystagmus is "involuntary, rhythmic movements of the eyes." *Mosby's Dictionary, Medical, Nursing & Allied Health* 1130 (5th ed. 1998).

Plaintiff's Reply at 2).  While the Commissioner argues that the Appeals Council action is supported by the substantial evidence produced at the administrative hearing, which is all that is necessary to reject Rivers' claim for benefits, she does not address the impact, if any, of his documented nystagmus on his ability to perform sedentary jobs.  And neither party addresses the complete absence of evidence from the vocational expert witness on the particular jobs that might be available to an individual with Rivers' limitations.  After a careful review of the record, as a whole, the court is persuaded that neither the decision by the ALJ, or the Appeals Council action, is based on substantial evidence and that Plaintiff's claim should be remanded for the reasons that follow.

First, it is important to clarify the actions that the Appeals Council is authorized to take when called upon to review a disputed ALJ decision.  The relevant social security regulations provide that the Appeals Council, on review of such a decision, may "affirm, modify, or reverse the administrative law judge hearing decision."  20 C.F.R. § 404.979.  Given the "pervasive" role of the Appeals Council's duties, as delegated by the Commissioner, it seems clear that independent fact finding is an appropriate function of that administrative body.  Indeed, it may review an ALJ's decision on its "own-motion" or even "itself assum[e] the responsibility for conducting a hearing." *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986); *see also* C.F.R. §§ 404.969; 404.956.  And "it is well-settled that final action by the Appeals Council becomes indeed the final determination of the [Commissioner] for purposes of judicial review under section 205(g), 42 U.S.C. § 405(g)." *Mullen*, 800 F.2d at 538 (citing *Hall v. Celebreeze*, 340 F.2d 608[] (6th Cir. 1965); *Cody v. Ribicoff*, 289 F.2d 394, 395 (8th Cir. 1961); *Goldman v. Folsom*, 246 F.2d 776, 778 (3d Cir. 1957); *cf. Weinberger v. Salfi*, 422 U.S. 749, 765 (1975)).  That, however, leaves open the question of "whether the statutorily-mandated deference to findings of fact under 42 U.S.C. § 405(g) runs in

favor of the Appeals Council or in favor of the ALJ," if a conflict exists between those two rulings. *Mullen*, 800 F.2d at 538. While the Fifth Circuit has never addressed this question directly, other circuits have done so, and have held that it "is the Council's decision that must be deferred to by the courts." *Mullen v. Bowen*, 800 F.2d at 545 (quoting *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)); *see also Schoenfeld v. Apfel*, 237 F.3d 788, 792 (7th Cir. 2001). Further, without reference to that precise issue, some decisions from this circuit clearly assess an Appeals Council decision in that manner if its findings differ from those of the ALJ. *See, e.g., Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). This also seems to be the approach that the Commissioner is arguing implicitly here, and so Rivers' complaints will be weighed against the Appeals Council decision which was issued on September 3, 2004.

**The Evidentiary Record**

At the hearing on January 27, 2004, Dr. Goldstein, a neurologist, testified as a medical expert witness. (Tr. at 78). Dr. Goldstein's testimony was derived entirely from a review of the records, and it pertained primarily to Plaintiff's seizures and alcohol use. From his review of Plaintiff's medical records, Dr. Goldstein concluded that Rivers had suffered from a seizure disorder "from the 1990's," and that he had a documented "history of alcoholism." (Tr. at 78). Dr. Goldstein testified further that Plaintiff's "seizures occur despite medication." (*Id.*). He also pointed to a notation in Plaintiff's medical records, from September 29, 1999, indicating that Rivers showed signs of "[c]erebella instability," which he surmised may be due to his seizure medications. (Tr. at 79). A neurological examination, performed in October 2000, showed that Rivers' "[c]erebella testing was normal[,] as were station and gait." (Tr. at 78). However, Dr. Goldstein also noted that, in a record from the Harris County Hospital District, dated December 17, 2003, it was reported that

9

Plaintiff had a "seizure disorder and [c]erebella atrophy with ataxia in balance and gait difficulty."

(Tr. at 79).  A subsequent neurological examination, in 2003, again revealed "mild ataxia," which

was described as "chronic."  (Tr. at 80).  Dr. Goldstein stated that the records from 2000 showed

"both therapeutic and sub-therapeutic values of Dilantin . . . intermittently he has had seizures and

intermittently also has been drinking."  (Tr. at 79).  In sum, Dr. Goldstein concluded that Plaintiff

> "does have seizures that are mainly nocturnal, that they occur frequently about once
> a month whether he's drinking or not.  But they usually are occurring at night and
> he has had problems intermittently with drinking alcohol that has resulted in some
> [c]erebella atrophy and some gait ataxia in addition to the problem with the seizures.
> We don't see any good etiology for the seizures to know whether they could be
> withdrawal seizures or exactly what, but they [the hospital staff] apparently they [the
> seizures] are present and he has been going to the hospital many times with the
> seizures.  But they're not well characterized in the record."

(Tr. at 80).  As noted, Dr. Goldstein found that Plaintiff had "some [c]erebella atrophy and some gait

ataxia in addition to the problem with the seizures."  (Tr. at 80).  In fact, Dr. Goldstein stated that

Plaintiff's seizure medication and the ataxia could lead to the assumption that he was intoxicated.

(Tr. at 85).  Rivers' attorney then asked Dr. Goldstein whether Plaintiff's ataxia, and the resulting

balance and gait difficulties, could pose limitations to his ability to walk, to stand or to carry things.

(Tr. at 89).  In response, Dr. Goldstein testified "I don't really have a good description of the degree

of the ataxia that he has and how that would affect his ability to work."  (Tr. at 89-90).  He was then

questioned about the significance of the record, from December 2003, which reported that Rivers

suffered from cerebellar atrophy, ataxia, and gait difficulty.  Dr. Goldstein responded that, from the

records available, "the significance is not clear."  (Tr. at 90).

Dr. Nancy Tarrand, a psychiatrist,  also testified as a medical expert witness at the hearing

before the ALJ.  Her testimony was very brief and centered primarily on whether Rivers suffered

from any mental impairments that could affect his ability to work.  (Tr. at 91-94).  Dr. Tarrand

stated that, from her review of the records,  Plaintiff "does not have a severe psychiatric impairment." (*Id.*).  She did acknowledge, however, that he suffered from a  "a seizure disorder" and had a history of  "alcohol abuse."  She also stated that his  "possible [c]erebella dysfunction" had "already been covered by Dr. Goldstein," and she had no information to add on that impairment. (Tr. at 91-92).  Dr. Tarrand  testified that Rivers had given varying dates on his periods of sobriety throughout his medical history.  She told the ALJ that "[i]nconsistent dates from the attainment of sobriety . . . usually indicate that someone has not achieved full sobriety."  (Tr. at 92).  However, in response to a question from Rivers' attorney about whether the differing dates could result from "[c]erebella atrophy and memory loss and possibly furthered by [his] Dilantin level," she replied that "[t]here are a variety of factors which could influence his ability to remember." (Tr. at 94).  She repeated, however, that in her opinion, it was due to "not attaining sobriety."  (*Id.*).

In addition to the testimony from the non-examining physicians, the ALJ also had before him a record from February 14, 2001, when Plaintiff was seen at the Harris County Hospital District Neurology Clinic for a follow-up exam related to his seizure disorder.  (Tr. at 804).  On that date, the staff noted that, among other complaints, Rivers was suffering from "mild end horizontal [unintelligible] nystagmus." (Tr. at 804).  Two months later, in April 2001, he returned to the Harris County Hospital District Seizure Clinic, and the record from that date shows that he was again experiencing a "horizontal nystagmus on lateral gaze."  (Tr. at 803).

When  the Appeals Council, in February 2003, remanded and consolidated  Rivers' claims for a hearing before a new ALJ particular attention was drawn to the need to consider two medical source statements from Plaintiff's treating physician, Dr. Sheela Sadhwani.  Those statements, dated June 1, 2000, and July 14, 2001, were available to the ALJ for his review and consideration at the

hearing.  In her June 2000 statement, Dr. Sadhwani  reported that Rivers suffered from a generalized seizure disorder, which resulted in as many as 6 seizures a month, during which he lost consciousness. (Tr. at 1334).  She further reported that his seizures usually occurred with no warning, and that he  was left confused, exhausted and suffering from  a severe headache when they ended. (Tr. at 1335).  She stated that, on average, these effects last for 3 days, and that they render him "unable to do daily activities."  (Tr. at 1336).  She recounted the level of Dilantin, an anti-seizure medication prescribed for him, and reported the following side effects from that medicine: "dizziness, eye focusing problems, lethargy, coordination disturbance, and lack of alertness." (*Id.*). She also reported that his seizure disorder was likely to "disrupt" co-workers, require added supervision, and generate "memory problems".  (Tr. at 1337).  Further, she reported that, in the workplace, Rivers would need  as many as 4 unscheduled breaks in an 8 hour day, and that his impairment could lead to as many as 3 absences in a month.  (Tr. at 1337-38).  She reported no exertional limitations as a result of the seizures.

In the report from 2001, Dr. Sadhwani stated that Rivers had been her patient since 1998, and his impairment was now described as one which caused both " localized and generalized seizures."  (Tr. at 1408).  In this report, Dr. Sadhwani stated that Plaintiff suffered seizures from "two times a day to1-2 a week." (*Id.*).  In 2001, she  also cited  the  presence of ataxia,  depression, and social isolation, as other disorders she observed..  (Tr. at 1410-11).  The remainder of her findings were consistent with the earlier source statement, with the exception of an explicit finding that his seizures were not "ethanol related."  (Tr. at 1411).

Plaintiff also testified at the hearing, but his testimony was quite brief.  The ALJ never posed any questions to him, and his testimony in response to his attorney's queries consists of perhaps

12

three pages in the transcript.  (Tr. at 98-101).  He did testify, however, that he had gone for long periods in which he did not drink, and yet he still suffered seizures.  (Tr. at 99).  He was asked about the source of a head injury he suffered earlier and he testified that he "fell out of a tree."  (*Id.*).  When asked whether people ever suspected that he was intoxicated because of his slurred speech and poor balance, even though he had not been drinking, Plaintiff replied "[y]eah."  (Tr. at 101).

Further, the ALJ heard testimony from Karen Neilson, a vocational expert.  Although the remand order was specific in dictating the evidence that the ALJ was to elicit concerning Rivers' work abilities, her entire testimony constitutes approximately one and one half pages in the transcript.  The ALJ's examination of Ms. Neilson is reproduced below, in its entirety:

Q. Dr. [sic] Neilson, how would you categorize his past work?

A. He's worked primarily as a welder, which is medium, semi-skilled.

Q. And if he performs a heavy work but must avoid heights, driving, and dangerous machinery, could he perform that work?

A. No, sir.

Q. Would he have any really transferable skills?

A. To the – no, sir.

Q. And if a person – what – had those limitations of avoiding the usual seizure precautions, that is, if it were to be taken, what percentage of heavy, medium, light, and sedentary work could still be performed?

A. Well, there's more in the medium heavy because those require more machines and around more sites that would have dangerous equipment.  So, it goes 30 percent medium.

Q. Would those be eliminated or still possible?

A. Those would be eliminated.

Q. Okay. And medium?

A. Yeah,  medium, heavy 30 percent and  light because they say they really – so that's 20 percent light.

13

Q. Any sedentary?

A. And sedentary they really don't say that there's any - there's no heights or driving or heavy moving machinery and dangerous equipment in sedentary and they'd even questioned the sewing machine as not being dangerous.  So that was the debate.

(Tr. 94-95).

Ms. Neilson was then questioned by Rivers' attorney, who asked whether "poor balance, trouble speaking, and memory loss," would present a "problem for an employer?"  (Tr. at 97).  She testified, in response, that "you would have to say…what kind of jobs… whether they had to relate to the public… I don't know that I could answer that."  (Tr. at 97).

**The ALJ's Findings**

Based on his assessment of the evidence presented, the ALJ found that, although Plaintiff suffers from the severe impairments of a seizure disorder, and the effects of alcohol abuse, those conditions, singly or in combination, do not meet the criteria under the appropriate SSA listings. (Tr. at 32).  For that reason, he concluded that Plaintiff is not disabled and he denied his claim.  (Tr. at 41).  In making this decision,  the ALJ relied on Dr. Goldstein's testimony that the medical records undeniably showed that Plaintiff suffered from seizures, but that he was not compliant with treatment advice and continued to drink alcohol, even while taking anti-seizure medication.  (Tr. at 33).  As evidence of this noncompliance, the ALJ  underscored an entry in one medical report, from January 9, 2002, that stated Plaintiff exhibited slurred speech when he appeared for an examination. (Tr. at 38).  While acknowledging that Rivers suggested that slurred speech was a result of his cerebellar atrophy, the ALJ found that it was more likely due to alcohol use.   In fact, he cited a test the previous month that was positive for alcohol use.  (Tr. at 39). The ALJ also found that Rivers' subjective complaints were "only of a mild degree,"  and   "not at all credible." (Tr. at 39).  He

14

Case 4:04-cv-03292   Document 21   Filed in TXSD on 03/03/06   Page 15 of 20


concluded that Rivers had no exertional limitations, but did require seizure precautions, including the need to avoid unprotected heights, dangerous machinery, and driving. (*Id.*). And, although the ALJ found, from Ms. Neilson's testimony, that Rivers was unable to return to his past work, he concluded that there were jobs available in the regional economy that he could perform. (*Id.*). From her testimony, the ALJ further concluded that Plaintiff could perform 70 percent of the available heavy and medium unskilled jobs; 80 percent of light unskilled jobs; and 100 percent of unskilled sedentary jobs. (Tr. at 40). From these conclusions, the ALJ determined that Plaintiff was not under a "disability" as defined under the Act. (Tr. at 42).

It is evident from this record that the ALJ made no findings in regard to Plaintiff's ataxia and, in fact, only once referenced his cerebellar atrophy. And he made no mention, at all, of Rivers' gait problems or nystagmus. This is so despite Dr. Goldstein's testimony on the records that showed Plaintiff suffered from cerebellar ataxia, and despite the information in the medical source statements from Dr. Sadhwani.[4] Nor did the ALJ identify any limitations that may result from that impairment, from the documented nystagmus, or from the treating physician's findings. Following the ALJ's decision, Plaintiff requested an SSA review, and the Appeals Council granted that request. It then "adopted the Administrative Law Judge's … issues in the case, and the evidentiary facts, as applicable." (Tr. at 16). However, on the same body of evidence, the Appeals Council concluded that Plaintiff suffered from seizures and the effects of alcohol abuse, but it also found Rivers' ataxia to be a severe impairment. (Tr. at 17). It then determined that, with these impairments, Rivers could not engage in the level of work that the ALJ found appropriate. (*Id.*). Rather, in its decision, the

---

[4] Cerebellar ataxia is a loss of muscle coordination caused by a lesion in the cerebellum. *Mosby's Dictionary, Medical, Nursing & Allied Health* 297 (5th ed. 1998).

Appeals Council "considered the vocational expert's testimony that the claimant can perform 100 per-cent of all unskilled sedentray [sic] jobs in the national economy, and concludes that there are jobs existing in significant number in the national economy that the claimant can perform." (Tr. at 17). It found further that the seizure precautions designated by the ALJ were still necessary, but given the revised findings, the Appeals Council agreed with him that Plaintiff is "not disabled." (Tr. at 18).

Whether there was sufficient evidence from which the Appeals Council could properly determine that Rivers is able to perform any range of sedentary work, is the question now before the court. The answer to that question is bound by the well recognized legal and regulatory standards applicable to all disability decisions. Obviously, neither the ALJ's decision or the findings by the Appeals Council can be allowed to stand in the absence of substantial evidence in the record to support them. And, there is no question that the Commissioner, at either fact finding stage of the proceedings, has a duty to ascertain all information necessary to develop a "full and fair record." *Kane v. Heckler* 731 F.2d 1216, 1219 (5th Cir. 1984). In addition, in this case, the ALJ was under a specific mandate from the 2003 remand order to take particular note of several matters relevant to Rivers' claim. A review of the record, as a whole, persuades the court that not only did the hearing fail to produce some of the very evidence specified by the Appeals Council in the remand order, but there is otherwise no substantial evidence from which either the ALJ or the Appeals Council could fairly assess the level of Rivers' residual functional capacity to determine whether any work, sedentary or not, is actually available to him.

At the outset, the record could not be more clear that the medical expert witness did not have sufficient information available to him so that he could provide a credible opinion, or any opinion,

16

on the impact of Plaintiff's ataxia on his ability to work.  Dr. Goldstein was forthcoming in testifying that he was hampered by the absence of pertinent medical evidence on that condition, but the ALJ took no steps to develop the record on that matter.  It is well-settled that, under the Social Security Act, and its implementing regulations, an ALJ is required to develop the facts related to a claim of disability "fully and fairly." *Kane v. Heckler*, 731 F.2d at 1219; 42 U.S.C. 405(g); 20 C.F.R. 410.640.  If he fails to do so, his decision is not supported by substantial evidence, and is subject to reversal if the error results in prejudice to the claimant. *Newton*, 209 F.3d 448 (5th Cir. 2000); *Ripley v. Chater*, 67 F.3d 552, 557 (5th Cir. 1995).  Further, because, on review, the Appeals Council "revised" the ALJ's findings to include ataxia as another severe impairment, it goes without saying that the impact of that impairment, and any relevant limitations resulting from it, are critical to a valid disability finding.  On this scarce record, the court is not persuaded that the Appeals Council decision to exclude all other categories of work except sedentary, satisfactorily redresses the failure by the ALJ to develop the record on that impairment.

Moreover, Fifth Circuit decisions are consistent that, to support a non-disability finding, any hypothetical question posed to a vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ" and that are supported by the objective medical evidence. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *and see Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988).  Here, the hypothetical questions the ALJ used did not incorporate any limitations that may relate to Plaintiff's gait disturbance, visual impairment, side effects from medications, or post-seizure consequences.  Instead, the ALJ asked about only the limitations he found credible and relevant to the seizure disorder alone.  Significantly, the ALJ

17

determined, from Ms. Neilson's testimony, that Plaintiff could perform the full exertional range of work, limited only by seizure precautions.  (Tr. at 40-41).  On this same evidence, however, the Appeals Council found, presumably because of his ataxia,  that Plaintiff had the ability to perform sedentary jobs only.  The court finds that the hypothetical questions the witness answered lacked necessary reference to the limitations imposed by Plaintiff's gait and vision problems, as well as the uncontroverted after effects of his seizures and the medication for that disorder.  For this reason, the Appeals Council's decision that Plaintiff's ataxia was severe, but not severe enough to render him disabled, is not supported  by  substantial evidence. *See Ripley*, 67 F.3d at 557.  That reasoning is even  more compelling in regard to the failure to develop the record on the level of, and  limiting impact, if any, of Rivers' documented nystagmus.  On this record, there is simply no information from which the ALJ, much less the Appeals Council, could determine that Rivers' nystagmus imposed no limitation on his ability to perform a full or reduced range of sedentary work.

As a final matter, it is important to recognize that the ALJ's duties following the remand of a disability determination, is governed by the applicable  administrative regulations.  Those regulations  provide, expressly, that:

> The administrative law judge *shall* take any action that is ordered by the Appeals Council and may take any additional action that is not inconsistent with the Appeals Council's order.

*Houston v. Sullivan*, 895 F.2d 1012, 1015 (5th Cir. 1989); 20 C.F.R. § 404.977(b); 416.1477(b) (emphasis added).  Because the regulatory language is mandatory, instructions to an  ALJ in a remand order govern  the procedures to be followed at the subsequent administrative hearing.  (*Id.*). In this case, the remand order clearly directed the ALJ to specifically consider two medical source statements, from June 1, 2000, and July 14, 2001, that were prepared by Plaintiff's treating physician,

Dr. Sheela Sadhwani.  (Tr. at 168).  The June 2000 statement reflects that Plaintiff had problems focusing his eyes after his seizures, and the July 2001 statement noted that he had symptoms of ataxia. (Tr. at 1336, 1410).  In his review of the medical source statements made by Dr. Sadhwani, however, the ALJ confined his discussion to the evidence of Rivers' seizures, and he made no mention of the doctor's assessment that he exhibited signs of ataxia.  (Tr. at 36).

Further, the ALJ was ordered, expressly, to develop evidence from a vocational expert witness, and to "ask the vocational expert to identify examples of appropriate jobs." (Tr. at 170). The record is unmistakable that the ALJ did not do so here.  He asked no questions about particular jobs that Rivers was capable of doing or whether such jobs were available.  Had he followed the instructions in the remand order, Plaintiff would have had the opportunity to confront and perhaps rebut, any testimony about prospective jobs identified by the vocational expert witness.  This error is heightened in light of the Appeals Council's modification of the ALJ's decision, which reduced the range of jobs Plaintiff can purportedly perform. That clear disregard of the instructions in the remand alone merits a remand of Plaintiff's disability claim for a full and fair consideration.  *See* 20 C.F.R. § 404.977(b).

As the Fifth Circuit has expressed, repeatedly, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required." *Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981).  "If prejudice results from the violation, the result cannot stand." *Id.* Clearly, Rivers' rights were affected when the ALJ did not comply with the Appeals Council's specific instructions on the necessary evidence, relevant to Plaintiff's ability to work, that he was to elicit and consider on remand.  *See* 20 C.F.R. § 404.977.  And Plaintiff has been further prejudiced by the failure to develop the evidence on the other documented impairments which likely produce further limiting effects on his ability to return to the workplace.  Accordingly, Plaintiff's

19

motion should be granted.  Because of the Commissioner's serious and serial errors, Rivers has been without benefits since 1998, while his claim has been subjected to misjudgments all the way through the administrative process.  For this reason,  it is further RECOMMENDED that this matter be reversed and remanded to the Commissioner with instructions to grant Rivers' application and calculate the disability benefits due.  *See* 42 U.S.C. § 405(g); *McQueen v. Apfel*, 168 F.3d 152, 156 (5th Cir. 1999).

**Conclusion**

Based on the foregoing, it is RECOMMENDED that the motion for summary judgment by Plaintiff Anthony Rivers be GRANTED, and that the motion by Social Security Commissioner Jo Anne B. Barnhart be DENIED.

The Clerk of the court shall send copies of this memorandum and recommendation to the respective parties who will file written objections thereto **on or before March 16, 2006**, ten days from receipt, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 80-5, S.D. Texas.  Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, room 11535, **and** to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this  3rd  day of March, 2006.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**